## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HAROLD PUTMAN,
    Plaintiff,
v.                                      Docket No. CA 05-1796
JONATHAN W. DUDAS,                      Washington, D.C.
    Defendant.                          December 20, 2005
                                        11:00 a.m.

TRANSCRIPT OF INITIAL STATUS CONFERENCE
BEFORE THE HONORABLE JOHN GARRETT PENN,
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:    WALKER & JOCKE
                      Ralph E. Jocke, Esq.
                      Patricia Walker, Esq.
                      231 S. Broadway
                      Medina, OH 44256
                      330.721.0000

For the Defendant:    US PATENT & TRADEMARK OFFICE
                      Office of the Solicitor
                      William LaMarca, Esq.
                      Heather F. Auyang, Esq.
                      600 Dulany Street
                      Madison West, 8C43-A
                      Alexandria, VA 22314
                      571.272.9035

                      UNITED STATES ATTORNEY'S OFFICE
                      Benton Gregory Peterson, AUSA
                      555 North Street, NW
                      Washington, D.C. 20530

Court Reporter:       Scott L. Wallace, RDR, CRR
                      Official Court Reporter
                      Room 6814, U.S. Courthouse
                      Washington, D.C. 20001
                      202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

## Page 2

**MORNING SESSION, DECEMBER 20, 2005**

(11:04 a.m.)

THE DEPUTY CLERK: Calling the case of *Harold Putman versus Jonathan W. Dudas*, Civil Action 05-1796. Mr. Jocke, Ms. Walker and Mr. Wilson on behalf of the plaintiff; Mr. Peterson, Mr. LaMarca, Ms. Auyang on behalf of the defendant.

THE COURT: Good morning, counsel.

ALL PARTIES PRESENT: Good morning, Your Honor.

THE COURT: This matter is before the Court for an initial hearing. Are there any preliminary matters that you wish to address with the Court before we go forward?

MR. PETERSON: Not that we are aware of, Your Honor.

THE COURT: What's that?

MR. PETERSON: None that we're aware of right now, Your Honor.

THE COURT: All right. Counsel, I have received your joint statement. I understand that there's some disagreement between the parties, but if the plaintiff would take a few minutes and just set out the facts of the case for me.

MR. JOCKE: Thank you, Your Honor. With your permission, I brought a few pages that I think may be helpful in explaining the nature of the case.

This is an action, Your Honor, that's been brought by Harold Putman as an inventor, a patent applicant. The patent application itself is a --

## Page 3

THE COURT: Now, is Mr. Putman here?

MR. JOCKE: No, he's not. He assigned his invention as an employee of the company and his invention is assigned to Diebold, Incorporated and Diebold is the owner of all right and title to the invention.

Diebold is a company that's been around for a long time. They were founded in 1859 in Ohio and they continue in business. Diebold's original claim to fame was that they were the only ones who made safes whose contents survived the great Chicago fire in 1871 and that's what really caused their business to take off. They're still in business making security products for banks, such as vaults and locks and things of that type. But today, their primary business is that of a maker of ATM machines. And they are a U.S. manufacturer of ATM machines, one of the few that's still making those machines in the United States.

THE COURT: One of the few making those machines in the United States?

MR. JOCKE: Yes, sir.

THE COURT: Where are the others made?

MR. JOCKE: Well, NCR, the largest manufacturer of those machines -- they have their operations in Scotland.

THE COURT: Scotland?

MR. JOCKE: Yes, sir.

THE COURT: All right.

MR. JOCKE: And then there are other smaller

## Page 4

manufacturers, Korean manufacturers, such as Hyosung, Brazilian manufacturers, but we're the U.S. manufacturer.

THE COURT: I see. Okay.

MR. JOCKE: The invention that the patent was applied for is an ATM that uses what Diebold calls the "screen and dialogue definition"; it's a language -- software -- called SADDLE. And simply put, prior ATM machines had one software program that controlled all of the things in the machine. And as you can imagine, Your Honor, there are thousands of things that have to happen as you walk up to that machine, put in your card, put in your secret number through the buttons and the devices operate.

And all of those things, before this invention was filed more than seven years ago, were pretty much done through one software program that took care of everything. And as the slide states, some of the drawbacks of doing that are that it has to be specific to that particular kind of machine; it's time consuming to create and very difficult to change because if you change one thing, that impacts a whole bunch of other things.

The concept of the --

THE COURT: When you say "change," change like what?

MR. JOCKE: Well, what happens is you may have to replace a card reader that was on the machine. It becomes no longer available because it's been discontinued or it's obsolete or there's a better one. So when you go to start putting a new card reader either on machines that are already in the field or those

5

11:09AM 1 that you are making in your factory, you've now got to change the
11:09AM 2 programming in order to address that new machine. It's going to
11:09AM 3 be different.
11:09AM 4     And of course, as you change something over here, you can
11:09AM 5 almost think of it as a house of cards. When you do something
11:09AM 6 over here, it may impact something over here and that makes it
11:09AM 7 somewhat difficult to make any modifications. And modifications
11:09AM 8 are very frequent.
11:09AM 9     The SADDLE idea was really to take the software and break
11:10AM 10 it up into three distinct building blocks. The one building
11:10AM 11 block is the Transaction-Machine Interface or the TMI. And that
11:10AM 12 operates the screen and it communicates with the user button and
11:10AM 13 it takes care of the things that interact with a user. And the
11:10AM 14 software that does that is in that particular building block.
11:10AM 15     And then another building block is what's called the Event
11:10AM 16 Processors. And those things specifically take care of a given
11:10AM 17 device or devices. You can think of that as something that you
11:10AM 18 tell the device to dispense cash, you send it a message to do
11:10AM 19 that, it does it and it reports back whether it did it or not.
11:10AM 20     And then the third element is what we call an Instruction
11:10AM 21 Document. It's software, but it has the text in it that's going
11:11AM 22 to be displayed on the screen throughout the transactions that
11:11AM 23 you might conduct. It also tells the TMI part what Event
11:11AM 24 Processor to talk to when something happens, when that screen is
11:11AM 25 up there, and what to say, so it acts as sort of the source of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6

11:11AM 1 the text as well as the traffic cop to address the particular
11:11AM 2 Event Processor.
11:11AM 3     And the advantage of doing it this way is that it makes it
11:11AM 4 pretty easy to change because things are isolated in their
11:11AM 5 particular building blocks. And particularly if you want to
11:11AM 6 change the screen language, if you want to have alternatives in
11:11AM 7 different languages or different kinds of things, that can be
11:11AM 8 addressed by simply changing the document instructions.
11:11AM 9     It's also more cost effective because what happens is you
11:11AM 10 can use the document part and you can put that in different types
11:11AM 11 of ATM machines. And so you can take that over to a completely
11:12AM 12 different type of machine and it will provide the same kind of
11:12AM 13 interface, the same instructions, and it will work the same way.
11:12AM 14     The history of this in the Patent Office is that, as I
11:12AM 15 say, the patent application was filed seven years ago now; the
11:12AM 16 patent examiner rejected all the claims in the application and
11:12AM 17 then it went up to the Board of Appeals and Interferences within
11:12AM 18 the Patent Office and the Patent Office Board of Appeals reversed
11:12AM 19 the examiner on the claims indicated, 20 of the 56 claims. The
11:12AM 20 Board did sustain some of the rejections on various grounds.
11:12AM 21     And this action is brought pursuant to 35 U.S.C. 145,
11:12AM 22 which allows a patent applicant to bring a civil action to obtain
11:12AM 23 a patent.
11:12AM 24     The plaintiff's position in this is that the patent
11:13AM 25 application is technically complete and discloses the inventions

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7

11:13AM 1 that are there; the prior art that the Patent Office cited
11:13AM 2 against it really doesn't have anything to do with ATMs, at least
11:13AM 3 for the most part, and the SADDLE ATM is not obvious or
11:13AM 4 anticipated, based on anything that's come before.
11:13AM 5     One of the key issues in this case involves an Internet
11:13AM 6 posting that's called the Bosak Internet posting and the Patent
11:13AM 7 Office cited it as prior art, but that posting was not made until
11:13AM 8 after Mr. Putman's patent application was filed, so we don't
11:13AM 9 believe that that is appropriate prior art.
11:13AM 10     And then this is an invention that was made and reduced to
11:13AM 11 practice within the United States. The Patent Office currently
11:13AM 12 contends that even though the Board allowed or indicated some
11:13AM 13 claims were not rejected, the Patent Office is contending now
11:14AM 14 that none of the claims here are patentable and so, because this
11:14AM 15 invention was made in the United States, we have the ability to
11:14AM 16 claim the invention as of the date that it was first made rather
11:14AM 17 than the date that the application was filed and if necessary,
11:14AM 18 depending on what the Patent Office brings against us, we will
11:14AM 19 show that.
11:14AM 20     And we believe that the SADDLE ATM qualifies for patent
11:14AM 21 protection by being new, useful, novel and unobvious.
11:14AM 22     THE COURT: All right. Anything else about the -- what is
11:14AM 23 the relief you're seeking here, then?
11:14AM 24     MR. JOCKE: We are seeking a decision from the Court that
11:14AM 25 the invention as claimed qualifies for patent protection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8

11:14AM 1     THE COURT: And what about the decision by the Board?
11:14AM 2 What impact does that have on any hearing here?
11:15AM 3     MR. JOCKE: Well, Your Honor, the -- it's our position
11:15AM 4 that certainly the record within the Patent Office comes in as an
11:15AM 5 administrative record. It should be admissible in evidence.
11:15AM 6     However, the Supreme Court itself has said that when you
11:15AM 7 come to court, it's basically something that is considered
11:15AM 8 *de novo* by this Court, reviewing whether or not a patent should
11:15AM 9 be granted.
11:15AM 10     THE COURT: All right. Thank you.
11:15AM 11     MR. JOCKE: Thank you.
11:15AM 12     THE COURT: Mr. Peterson, let's hear your side of the
11:15AM 13 story.
11:15AM 14     MR. PETERSON: Good morning, Your Honor.
11:15AM 15     THE COURT: Good morning.
11:15AM 16     MR. PETERSON: For the purposes of this proceeding, Your
11:15AM 17 Honor, the defendant doesn't quibble with the history that was
11:15AM 18 cited. I think the most germane part of this is that we do
11:15AM 19 maintain that the patent applications represented unpatentable
11:15AM 20 applications in that, under 35 U.S.C. 102 and 103, there are
11:16AM 21 certain prerequisites that were required of the potential patent
11:16AM 22 holder that weren't fulfilled and certain patents themselves
11:16AM 23 failed under that statutory provision as obvious.
11:16AM 24     And to the degree that the Court looks for more
11:16AM 25 information with regard to that, we'll be happy to brief that for

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 9**

11:16AM 1  you.
11:16AM 2       The purpose -- for the purposes of this proceeding, we
11:16AM 3  would just like to state that we have certain disagreements with
11:16AM 4  regard to areas concerning a protective order or secrecy
11:16AM 5  provision with regard to the document that we filed, the Joint
11:16AM 6  Status Report. We still maintain that we can make an argument to
11:16AM 7  say that the secrecy order or the protective order that the
11:16AM 8  plaintiff seeks in this case is unnecessary for the purposes of
11:17AM 9  this proceeding in Federal Court.
11:17AM 10      Our story -- our side of the story is basically that there
11:17AM 11 are precedents before the Board on the administrative level that
11:17AM 12 maintain that you -- if you have evidence that you want to bring
11:17AM 13 forward, you should bring forward that evidence at that level.
11:17AM 14 We anticipate that --
11:17AM 15      THE COURT: "At that level" being the --
11:17AM 16      MR. PETERSON: At the administrative level, yes. We
11:17AM 17 anticipate that the plaintiffs may attempt to bring forth new
11:17AM 18 evidence that wasn't before the Board at the administrative level
11:17AM 19 and to that extent, as you may have read in our joint statement,
11:17AM 20 we hope to perhaps file a motion to exclude that evidence from
11:17AM 21 this proceeding. That's --
11:17AM 22      THE COURT: "That evidence" being any new evidence?
11:18AM 23      MR. PETERSON: "That evidence" being new evidence.
11:18AM 24      THE COURT: So you're looking at this primarily as a
11:18AM 25 review of the decision by the Board?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 10**

11:18AM 1       MR. PETERSON: That's correct, Your Honor.
11:18AM 2       THE COURT: And nothing else?
11:18AM 3       MR. PETERSON: Well, in terms of sustaining the Board's
11:18AM 4  decision, that's what we're after.
11:18AM 5       THE COURT: Anything else that you can say to enlighten
11:18AM 6  me?
11:18AM 7       MR. PETERSON: In terms of the factual background, Your
11:18AM 8  Honor?
11:18AM 9       THE COURT: Yes.
11:18AM 10      MR. PETERSON: From our perspective, you know, there isn't
11:18AM 11 any more in terms of the factual background that we have at this
11:18AM 12 point.
11:18AM 13      I would like to confer with my clients just for a second.
11:18AM 14      THE COURT: Surely.
11:18AM 15      (Brief pause.)
11:18AM 16      MR. PETERSON: Your Honor, we have Mr. LaMarca here.
11:19AM 17      MR. LaMARCA: Your Honor, I just wanted to clarify the one
11:19AM 18 point.
11:19AM 19      THE COURT: And you're Mr. --
11:19AM 20      MR. PETERSON: LaMarca.
11:19AM 21      MR. LaMARCA: LaMarca, correct, for the PTO.
11:19AM 22      With respect to new evidence or new arguments, I think,
11:19AM 23 just to clarify what Mr. Peterson said, we take the position in
11:19AM 24 this case there were certain evidence and arguments that the
11:19AM 25 plaintiff had in his possession before the Board -- voluntarily

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 11**

11:19AM 1  chose not to present that evidence and arguments to the Board.
11:19AM 2  That's the evidence that we would move to exclude in this case.
11:19AM 3       THE COURT: Why?
11:19AM 4       MR. LaMARCA: Well, we think the case law supports that
11:19AM 5  position that a plaintiff cannot sandbag the Patent Office.
11:19AM 6  Basically, if you read the case law from this district, the
11:19AM 7  District of Columbia -- and we can cite plenty of case law for
11:19AM 8  you if we brief this issue -- that when you're before the agency,
11:19AM 9  if you have evidence and arguments in your possession, you need
11:19AM 10 to present that evidence and arguments to the agency to give the
11:19AM 11 agency the opportunity to address those arguments and evidence.
11:19AM 12 You can't sit back, hold back the evidence, hold back the
11:19AM 13 arguments and then later, once you get to District Court, lay
11:19AM 14 that evidence and arguments on the court, in effect asking the
11:20AM 15 court to substitute itself for the examination expertise of the
11:20AM 16 agency.
11:20AM 17      So I think if you look -- what we pointed out in the joint
11:20AM 18 statement and what we would brief in a briefing on this issue is
11:20AM 19 we would argue to this Court that the current law of this
11:20AM 20 district is that that type of evidence and argument is not
11:20AM 21 permissible. And this Court in the past multiple times would not
11:20AM 22 allow plaintiffs to bring those types of evidence and arguments
11:20AM 23 in.
11:20AM 24      So I think that's just a clarification of the point
11:20AM 25 Mr. Peterson was trying to make earlier.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 12**

11:20AM 1       THE COURT: With respect to what you've just said as to
11:20AM 2  what this Court would allow or not allow, and I'm not asking for
11:20AM 3  a briefing at this point, but do you have any cases that I could
11:20AM 4  look at?
11:20AM 5       MR. LaMARCA: We didn't cite any cases in our joint
11:20AM 6  statement. And *DeSersky* -- there's a recent District Court
11:20AM 7  decision that's an unpublished decision that came out.
11:20AM 8       Do you know what judge --
11:20AM 9       MR. AUYANG: It was Judge Kennedy.
11:20AM 10      MR. LaMARCA: Judge Kennedy just had a case, another 145
11:21AM 11 action, where a similar issue was made, where there were
11:21AM 12 arguments about evidence and arguments that they had previously.
11:21AM 13 And the case law is pretty clear, we believe, that if you've got
11:21AM 14 the evidence and arguments in your possession before the agency,
11:21AM 15 a 145 appeal to the District Court is not an appropriate avenue
11:21AM 16 to get that evidence in. That evidence should have been brought
11:21AM 17 in before the agency when you had it.
11:21AM 18      Otherwise -- otherwise, plaintiffs would just simply
11:21AM 19 circumvent the agency all the time if it was to their advantage.
11:21AM 20 They would simply hold back evidence and arguments that they have
11:21AM 21 before the agency and then file a District Court suit like this
11:21AM 22 one and then bring all that evidence and arguments in later. And
11:21AM 23 the case law has developed to prevent that exact type of conduct.
11:21AM 24 And although I don't have the cites for you here today, when we
11:21AM 25 brief it, we will cite for you the case law that supports that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### Page 13

```
11:21AM  1       THE COURT: But you said that was a non-reported case?
11:21AM  2       MR. LaMARCA: But there are other precedential reported
11:21AM  3   cases. Hyatt v. Dudas is the lawsuit -- there are five or six --
11:21AM  4   Hyatt 145 actions where that issue has come up multiple times.
11:21AM  5   And that's been briefed and plenty of authority has been cited in
11:22AM  6   that briefing. We would cite similar authority in this case.
11:22AM  7       THE COURT: You seem to rely on Judge Kennedy's case.
11:22AM  8   When was that decided?
11:22AM  9       MR. LaMARCA: Recently.
11:22AM 10       MS. AUYANG: Your Honor, Heather Auyang. I think it was
11:22AM 11   in the last couple months.
11:22AM 12       THE COURT: Last couple months?
11:22AM 13       MR. LaMARCA: It's very recent.
11:22AM 14       THE COURT: Has there been an appeal?
11:22AM 15       MS. AUYANG: I'm sorry. What?
11:22AM 16       THE COURT: Has there been an appeal of that?
11:22AM 17       MS. AUYANG: No, there hasn't been an appeal.
11:22AM 18       THE COURT: And where would an appeal go?
11:22AM 19       MR. LaMARCA: Probably the Federal Circuit.
11:22AM 20       THE COURT: Federal Circuit?
11:22AM 21       MR. LaMARCA: Federal Circuit, correct.
11:22AM 22       THE COURT: All right.
11:22AM 23       MR. LaMARCA: So that's just a little bit of clarification
11:22AM 24   on that issue.
11:22AM 25       THE COURT: All right.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### Page 14

```
11:22AM  1       MR. LaMARCA: And also, Mr. Peterson also mentioned with
11:22AM  2   respect to a protective order, the PTO doesn't believe that this
11:22AM  3   proceeding should -- a protective order is appropriate. We
11:22AM  4   believe that this proceeding is a public proceeding just like any
11:22AM  5   court proceeding and that the protections of 35 U.S. Code 122
11:22AM  6   which apply to the Patent Office at the agency -- that this Court
11:22AM  7   is not bound by that statutory provision.
11:22AM  8       And we would brief that issue also. If the plaintiff
11:22AM  9   wants to move for protective order, we would want an opportunity
11:22AM 10   to respond and we will brief the issue for you so you can make an
11:23AM 11   informed decision.
11:23AM 12       And that's all I have. Thank you, Your Honor.
11:23AM 13       THE COURT: All right.
11:23AM 14   Mr. Peterson.
11:23AM 15       MR. PETERSON: In addition to what Mr. LaMarca just
11:23AM 16   informed the Court about, there -- just to set things out before
11:23AM 17   the Court so that you know where we're thinking, we may at some
11:23AM 18   point file a motion to remand with regard to the issues that have
11:23AM 19   not been placed before the Board in the proper manner,
11:23AM 20   specifically with regard to the issues that Mr. LaMarca had
11:23AM 21   mentioned, for purposes of negligence or purposes of the
11:23AM 22   plaintiff's own design, did not make it to the Board for the
11:23AM 23   Board's consideration.
11:24AM 24       So those issues, we feel we may have to file a motion to
11:24AM 25   remand with regard to those issues. And --
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### Page 15

```
11:24AM  1       THE COURT: Why would a party not present its entire case
11:24AM  2   before the -- if it has the evidence? Why wouldn't they have
11:24AM  3   presented the entire case before the Board?
11:24AM  4       MS. AUYANG: Your Honor, that's a good question. And in
11:24AM  5   this case, the plaintiff was specifically told to present all of
11:24AM  6   its evidence and he chose not to do so. And so the Patent Office
11:24AM  7   is looking to either exclude that evidence or remand the case
11:24AM  8   back to the PTO so that they can consider the entire record.
11:24AM  9       In addition, the office does contend that all the claims
11:24AM 10   in this patent, this patent application, are unpatentable under
11:24AM 11   certain statutory provisions. And we have additional rejections
11:24AM 12   that were not made in this record that we would also consider.
11:24AM 13   And so we may seek to file a motion to remand on that basis so
11:25AM 14   that the agency can take a fresh look at and it complete the
11:25AM 15   record for Your Honor.
11:25AM 16       THE COURT: What does the record, as you refer to it,
11:25AM 17   consist of?
11:25AM 18       MS. AUYANG: The record essentially consists of -- when a
11:25AM 19   patent applicant comes into the office, he files an application.
11:25AM 20   It's what's called a "specification" and it contains the claims
11:25AM 21   that this applicant thinks he's entitled to as his invention.
11:25AM 22   And as the office examines the application, it goes through sort
11:25AM 23   of a back and forth between the applicant and the patent
11:25AM 24   examiner, so we issue what's called an "office action." The
11:25AM 25   applicant responds. And so there's this back and forth type of
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### Page 16

```
11:25AM  1   correspondence, which is the record before the office. And
11:25AM  2   eventually, as plaintiff mentioned, it does go before the Board
11:25AM  3   at the PTO, which issues a decision and which is now before you,
11:25AM  4   Your Honor.
11:25AM  5       And we contend that this is, in fact, a hybrid trial, and
11:25AM  6   so that the agency record and the fact finding before the Board
11:26AM  7   should be given substantial evidence review and if, in fact,
11:26AM  8   there is any new evidence that's allowed in this case, that would
11:26AM  9   be possibly de novo.
11:26AM 10       But at this point, Your Honor, we're looking to remand the
11:26AM 11   case because we have all of this -- additional issues that we
11:26AM 12   need to deal with before the office, including new rejections and
11:26AM 13   evidence that was never considered that the office told the
11:26AM 14   applicant to submit and the applicant intentionally withheld that
11:26AM 15   evidence.
11:26AM 16       THE COURT: All right. Thank you.
11:26AM 17       MR. JOCKE: Your Honor?
11:26AM 18       THE COURT: Yes.
11:26AM 19       MR. JOCKE: I'm sorry. I didn't realize --
11:26AM 20       THE COURT: Is that all, Mr. Peterson?
11:26AM 21       MR. PETERSON: That's all for this side at this point.
11:26AM 22       MR. JOCKE: I wanted to make a couple of quick points.
11:26AM 23   They may be helpful.
11:26AM 24       First, as you'll notice, the Patent Office is taking the
11:26AM 25   position in this case that although the Board decided that many
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

17

1  of the claims met the requirements for patentability, they now
2  want to bring additional rejections. It would seem terribly
3  unfair for them to bring additional evidence to show that what
4  we're claiming isn't patentable without us being able to present
5  evidence to rebut that, those new arguments that they would wish
6  to make.
7  And I would draw the Court's attention to a Supreme Court
8  case, which is the *Dickinson versus Zurko*, and that's 50 -- let
9  me get the Supreme Court cite. It's -- I have the USPQ cite.
10  I'm terribly sorry. The USPQ cite is 50 USPQ2d 1930. It's a
11  case decided in 1999.
12  And what *Zurko* was about was that the Patent Office has
13  been -- had been trying for many years to have its decisions
14  covered under the Administrative Procedure Act, particularly when
15  appeal was taken directly from the Patent Office to the Court of
16  Appeals for the Federal Circuit.
17  There are two ways that an applicant can appeal the
18  decision of the Patent Office. One is a civil action like we
19  have here. The other is to go directly to the Federal Circuit.
20  And Mr. Peterson is correct in that if you're appealing directly
21  to the Federal Circuit, you cannot bring in new evidence in that
22  appeal.
23  What happened in the *Dickinson* case was the Patent Office
24  was arguing that more deference should be paid to their findings
25  in an appeal from the Patent Office to the Federal Circuit. The

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

18

1  Court discussed in detail on page 1936 of that decision the two
2  different standards that are applied in appeals when one takes
3  the different routes to the Federal Circuit, either directly from
4  the Patent Office or by filing a civil action, as we have here.
5  And you'll see, Your Honor, that the Supreme Court itself
6  in its most recent decision on this topic mentions that a patent
7  applicant is allowed to present additional evidence. And there
8  are other cases as well.
9  I'd also like to take a minute to address the issue of the
10  request for protective order. I would hope that Mr. Peterson and
11  I could agree to this. There is a statute; it's 35 U.S.C. 122.
12  I have only one copy of it, Your Honor, but I'm happy to provide
13  it, with your permission.
14  That's the version of the statute that applies to this
15  situation because it's the one that was in effect at the time
16  this patent application was filed. And it requires that the
17  Patent Office keep its information about inventions confidential.
18  The underlying rationale of filing a patent is that you
19  file a patent application and while it's pending, the Patent
20  Office is obligated to keep it secret. The -- if the patent
21  applicant chooses to then receive a patent, then the information
22  about their invention is made public for everyone to see in
23  exchange for a limited term of protection.
24  But until the applicant is granted a patent, then -- or
25  even if the applicant is never granted a patent, the Patent

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

19

1  Office is obligated to keep the information about that
2  application secret.
3  Here, Your Honor, we're dealing with ATMs. And although
4  the information in this application is getting kind of old,
5  nonetheless, what may be produced in discovery may be much more
6  current. Obviously, Diebold does not want information about how
7  its ATM machines work and how people could potentially hack them
8  to be disclosed without protection.
9  And so we would think that a protective order to keep
10  things secret would be appropriate. Courts have dealt with this
11  issue before. In fact, the case that was cited by the Patent
12  Office in their joint statement, which is the *In re Mosher* case,
13  was where the Court of Customs and Patent Appeals, which is
14  the -- excuse me -- the predecessor court to the Court of Appeals
15  for the Federal Circuit, was dealing with an issue like this,
16  where somebody was trying -- some third party was trying to gain
17  access to information about an appeal regarding a patent
18  application.
19  And the discussion by the Court is very good in terms of
20  saying it is the way the statutory scheme operates in that a
21  patent applicant has the right to have their application kept
22  secret until they are granted or at least have the opportunity to
23  be granted a patent, and then it's public.
24  And so we think a secrecy order would be appropriate and I
25  would hope we can agree on that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

20

1  Thank you.
2  THE COURT: All right.
3  MS. AUYANG: Your Honor, may I just please say a couple of
4  points?
5  I don't know if Your Honor has ever had a patent case, but
6  just -- what I wanted to tell the Court was that the Patent
7  Office is divided into different sections, so I'm with the
8  General Counsel's Office, there's an Examining Corps and then
9  there's the Board. The Examining Corps and the Board are
10  separate divisions.
11  And in fact -- so my point is that when the Board says
12  that certain claims seem patentable or they reverse the
13  examiner's rejection, it ultimately has to go back to the
14  Examining Corps and the Examining Corps is the corps that has the
15  ultimate authority to determine whether something's patentable.
16  So for example, even if Your Honor decided that it -- you
17  didn't agree with the Board decision and reversed those
18  rejections, it would still have to go back to the Patent Corps
19  for the Patent Corps to decide if there are in fact any new
20  rejections that can be made because we have an obligation, a
21  statutory obligation to only issue patentable subject matter.
22  And in fact in this case, we're seeking a remand because
23  we do have additional rejections that haven't been considered.
24  And as plaintiff's counsel pointed out, he's saying that it seems
25  unfair in this case to bring up additional rejections. And

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## Page 21

1  that's the point the Patent Office is making in that we are -- we
2  should in the first instance look at those rejections and, as
3  I've discussed with you, it would be a back and forth
4  correspondence once again with the applicant to address those
5  rejections. And that type of thing should take place before the
6  Patent Office and not in this Court.
7      On the issue of the protective order, we'd like to have
8  the opportunity to brief that because we feel that 35 U.S.C. 122
9  does not apply in a District Court action.
10     Thank you.
11     THE COURT: All right. Well, let me just go through a few
12 things that I believe are set out in your joint statement and see
13 if we're in agreement.
14     First, let me ask the plaintiff: You intend to file a
15 motion under 122?
16     MR. JOCKE: Your Honor, we will file a motion under
17 Rule 26 for a protective order to keep the file in the Patent
18 Office and any of the other things that pertain to the software
19 that operates the ATMs as secret, yes, sir.
20     THE COURT: The parties do not consent to a referral of
21 this case to a magistrate judge; is that right?
22     MR. PETERSON: That's correct, Your Honor.
23     THE COURT: Okay. And with respect to any amendment to
24 the pleadings or third party pleadings, you've requested -- I
25 guess you're in agreement that no pleadings will be permitted --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## Page 22

1  no amendments will be permitted after February 20th of next year.
2      You've discussed settlement, but you've reached no
3  agreement. How do you stand today on that? You've reached no
4  agreement, I take it?
5      MR. JOCKE: Your Honor, if you have the time to talk to
6  each party individually, I don't know, perhaps we could make some
7  progress. But again, I don't know if that's feasible.
8      THE COURT: Well, I wouldn't meet with the parties, but
9  what would happen is, if the parties are interested, we would
10 submit it to ADR. And how that works here is that I would enter
11 an order if the parties were in agreement. That order would be
12 sent up to our ADR unit. They would select a person who would be
13 involved. I would not know the name of that person. I would not
14 have any contact with that person whatsoever. You would be
15 dealing with that person.
16     Now, while it's at ADR, it would still be possible for the
17 case to proceed, for example, if there's discovery or whatever.
18 And then at some point, I would set a date when I would expect
19 some decision. And at some point, we would be advised whether
20 the case is settled or not settled and we would go from there.
21 So the Court would not get involved in any settlement
22 discussions.
23     MR. JOCKE: I understand.
24     THE COURT: But I take it at this point that isn't
25 anything that interests the parties?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## Page 23

1      MR. PETERSON: At this point, Your Honor, I think you're
2  right as far as the defendant is concerned. We do open -- we do
3  keep open the possibility for that at a later date, but at this
4  point, Your Honor, that's correct.
5      THE COURT: All right. Now, the parties feel that there
6  are some issues that may be resolved by summary judgment.
7      Just listening to the parties going back and forth,
8  would -- what is the approach to this case? Would there be a
9  motion filed at the beginning or would there be a motion filed at
10 the end with respect to any discovery? How are we going to
11 resolve the issue as to the nature of this case, whether it's
12 going to be a trial de novo or this is really just an
13 administrative proceeding? How do the parties intend to address
14 that?
15     MR. PETERSON: Well, Your Honor, as -- I think as we
16 contemplated in our joint statement, we had envisioned a certain
17 amount of discovery before we would file our dispositive motions
18 to clarify some issues through interrogatories and depositions.
19 And then at that point, we would file our dispositive motions.
20     MR. JOCKE: We don't know what the Patent Office's
21 contentions are with regard to -- we do not know why the Patent
22 Office would be asserting that the claims that the Board has
23 already indicated meet their requirements for patentability, what
24 they would be asserting on that. So we need to find that out
25 and, of course, would need to address it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## Page 24

1      It sounds like inherently one would need to put in some
2  evidence to address that, but we won't know until we get that
3  information in discovery. And that's one of the reasons why
4  discovery would be expected to take a little longer in that we
5  now need to find out what the Patent Office's contentions are.
6      THE COURT: All right. The parties have agreed to make
7  initial disclosures by January 23rd of next year; is that right?
8      MR. PETERSON: That's correct, Your Honor.
9      MR. JOCKE: Your Honor, if I may --
10     THE COURT: Why don't you just -- both of you, you can
11 stand close together.
12     MR. JOCKE: We would be making the disclosures, Your
13 Honor. Before we would put in documentation, we would appreciate
14 either getting a secrecy order in effect if we can agree to one;
15 if we cannot, then until a ruling was made on the extent of a
16 protective and secrecy order.
17     THE COURT: So here you're going to file a motion on that?
18     MR. JOCKE: It looks that way.
19     THE COURT: And when would we expect that motion?
20     MR. JOCKE: Probably by early January, Your Honor.
21     THE COURT: All right. And I note you have set forth a
22 limit as to the number of interrogatories that may be exchanged.
23     14 days after the Court rules with respect to the consent
24 order or the secrecy order, then you would exchange relevant
25 documents.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Page 25

1 What are "relevant documents"?
2 MR. JOCKE: Your Honor, the entire file of the Patent
3 Office, which is currently protected under 35 U.S.C. 122, and
4 then, as best I can determine, there may be documents related to
5 the creation of the invention itself that would be pertinent.
6 At this point, again, a lot of what's pertinent and what
7 we are in the position of proving depends on the Patent Office's
8 rejection, particularly of those claims that the Board did not
9 reject.
10 THE COURT: All right. Mr. Peterson, let me ask you, with
11 regard -- take a step back for a moment. Going back to the
12 so-called secrecy order, what's wrong with having the secrecy
13 order?
14 MR. PETERSON: Your Honor, if I understand --
15 THE COURT: It's sort of like maintaining the status quo,
16 I suppose, until certain issues are resolved. What's wrong with
17 that?
18 MR. PETERSON: If I understand the crux of your question,
19 Your Honor, beyond what's allowable by law, there may be some
20 equitable issues that concern the Court in terms of maintaining
21 the status quo, as the Court has mentioned.
22 Our position is that there may be -- well, we believe that
23 these issues that are before the Court today, that they are not
24 subject to a protective order because, one, they may have already
25 been released in certain areas to the public and it would be a

Scott L. Wallace, RDR, CRR
Official Court Reporter

Page 26

1 waste of time in that instance to protect them in any event; and
2 two, our approach is that once the -- once a potential patent
3 holder goes to Federal Court, the idea is that we would want that
4 to be a place of open forum. For that to happen, we would want
5 that to be place where the law applies to the patents that allow
6 them to be opened up for the public.
7 Now, to the degree that plaintiff can make an argument
8 that there isn't -- there hasn't been prior disclosures of this
9 information or that there would be some undue harm to the
10 plaintiff with regard to disclosing this information in the
11 context of a lawsuit, that's, of course, for the Court to decide.
12 But our position is that as of right now, we don't have
13 enough information to believe that this information is truly
14 secret in the sense that it's something that is under -- that has
15 been maintained as something that has been -- as a secret order
16 or as a secret patentable issue.
17 MS. AUYANG: Your Honor, the Patent Office -- it's our
18 policy that 35 U.S.C. 122 does not apply in District Court
19 actions and we have always thought that. And in fact, it's the
20 Department of Justice in their rules that the government, when
21 we're involved in an action, should -- it should be an open,
22 public forum. And so the applicant has chosen to sue us in
23 District Court and so this should be a public proceeding.
24 In addition, when an applicant sues us in the Federal
25 Circuit to try to obtain a patent, that proceeding is also not

Scott L. Wallace, RDR, CRR
Official Court Reporter

Page 27

1 secret and there are patent applicants there, so that proceeding
2 should in no way differ from this proceeding. And the plaintiff
3 hasn't shown why this particular application needs to be kept
4 confidential.
5 And that's why we would actually like the opportunity to
6 brief it before Your Honor. I think that would be the best way
7 than having us sort of randomly tell you comments about the
8 different rules, so Your Honor can have a better informed
9 decision.
10 MR. LaMARCA: I just wanted to add one point, Your Honor,
11 is that -- William LaMarca.
12 We have 50 to 60 appeals directly to the Federal Circuit
13 every year and every single one of those appeals is a review of a
14 Board decision and the administrative record. And I can't think
15 of a single one of them that had a protective order issued. In
16 other words, the Federal Circuit, just like this Court,
17 recognizes the court proceeding is a public proceeding and the
18 only instance --
19 THE COURT: Well, just because you have a protective order
20 doesn't mean it's not a public proceeding. We have a public --
21 MR. PETERSON: It's not --
22 THE COURT: We have protective orders in any number of
23 civil cases.
24 MR. LaMARCA: Absolutely, Your Honor. We understand that
25 in appropriate circumstances, a protective order is issued. We

Scott L. Wallace, RDR, CRR
Official Court Reporter

Page 28

1 understand that. We understand that this case would be no
2 different than any other case where the plaintiff would have to
3 come forth, meet the burden of showing why a protective order of
4 certain information would be required and this Court would then
5 grant that.
6 But as a *per se* matter, simply because matters --
7 applications are confidential between the PTO, this Court is not
8 bound by that statute. That's what the case law says. And in
9 general, there is no *per se* protective order automatically issued
10 simply because it's an appeal from an administrative proceeding
11 from the PTO. That's the point we're making, and that they would
12 have to meet the burden and we ought to have an opportunity to
13 respond to that and brief it for you.
14 THE COURT: All right. Now, the parties intend to call
15 expert witnesses in the case, is that right, depending upon how
16 the case proceeds?
17 MR. JOCKE: Right. It may depend.
18 THE COURT: But you may call expert witnesses in the case
19 and I understand that if that's the case, the plaintiffs would
20 disclose their witnesses in October 2006, the defendant would
21 disclose its witnesses in December of 2006.
22 Are those the dates that you had agreed to?
23 MR. PETERSON: Those are the dates --
24 THE COURT: Roughly?
25 MR. PETERSON: -- yes.

Scott L. Wallace, RDR, CRR
Official Court Reporter

29

11:47AM 1    MR. JOCKE: Yes, Your Honor.
11:47AM 2    THE COURT: And then you would complete discovery, all
11:47AM 3    discovery, in March of 2007? Is that what you're --
11:47AM 4    MR. PETERSON: Well, Your Honor, with regard to that,
11:47AM 5    we -- that date was discussed among the parties and we did agree
11:48AM 6    to that date after consultation with the plaintiff in the sense
11:48AM 7    that the plaintiff suggested that date. We don't have a problem
11:48AM 8    with it, but we understand that that's a bit unusual as far as
11:48AM 9    the length of time for discovery.
11:48AM 10   THE COURT: It is lengthy. Why would you need so much
11:48AM 11   time for discovery?
11:48AM 12   MR. JOCKE: Well, the -- what's odd about this case,
11:48AM 13   again, Your Honor, is that it seems that the basis for rejection
11:48AM 14   of the patent application itself is in flux and so we need to
11:48AM 15   discover that in order to address it. It's not like we can pick
11:48AM 16   up with the Board decision, overcome those arguments, which we
11:48AM 17   think we can very readily address, and then proceed from there.
11:48AM 18   There are additional bases that the Patent Office would
11:48AM 19   like to raise and it will take time to get that information. And
11:48AM 20   so -- and we also anticipated that we would probably have some
11:48AM 21   disagreements along the way: Things related to the protective
11:49AM 22   order and also the scope of the information that can be
11:49AM 23   introduced.
11:49AM 24   THE COURT: All right. You anticipate filing dispositive
11:49AM 25   motions in May of 2006, prior to the completion of discovery, if

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

30

11:49AM 1    there is discovery?
11:49AM 2    MS. AUYANG: Right. And in fact, Your Honor, as I
11:49AM 3    mentioned before, we plan on filing a motion to remand back to
11:49AM 4    the Patent Office to consider all of these different new
11:49AM 5    rejections that the office should have a first look at.
11:49AM 6    THE COURT: And when are you going to file that motion?
11:49AM 7    MS. AUYANG: We'd like to file it in the earlier part of
11:49AM 8    next year.
11:49AM 9    THE COURT: Because you're sort of -- it sounds to me like
11:49AM 10   you're saying that you don't need anything else except that
11:49AM 11   motion to remand it back. Is that what you're really saying?
11:49AM 12   MS. AUYANG: That's what we would like for Your Honor to
11:49AM 13   also agree with, yes, that if, in fact, the Patent Office should
11:50AM 14   look at these rejections in the first instance and have the
11:50AM 15   opportunity, with the applicant, to have a back and forth and
11:50AM 16   complete the record for Your Honor, I think that would be the
11:50AM 17   more appropriate course.
11:50AM 18   THE COURT: That goes back to, I guess, the original
11:50AM 19   question I raised. When would you expect to file that motion?
11:50AM 20   MS. AUYANG: Hopefully by February.
11:50AM 21   THE COURT: And that would be the motion to remand you're
11:50AM 22   referring to?
11:50AM 23   MS. AUYANG: Yes, Your Honor.
11:50AM 24   THE COURT: All right. I note that, I believe, the
11:50AM 25   parties have agreed to a dispositive motion; I guess this is in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

31

11:50AM 1    the case of discovery. They've agreed to a dispositive motion
11:50AM 2    60 days after the completion of discovery, which we roughly
11:51AM 3    calculate to be May of 2007; is that right?
11:51AM 4    MR. JOCKE: Yes, sir.
11:51AM 5    MR. PETERSON: That's correct, Your Honor.
11:51AM 6    THE COURT: And the parties would request oral argument,
11:51AM 7    but, as you know and I'm sure understand, you may or may not get
11:51AM 8    an oral argument. So don't leave anything out of your papers
11:51AM 9    assuming that you can touch upon it during oral argument because
11:51AM 10   there may not be one.
11:51AM 11   Anything else, counsel?
11:51AM 12   MR. PETERSON: Not from the defendant's side, Your Honor.
11:51AM 13   MR. JOCKE: No, Your Honor.
11:51AM 14   THE COURT: All right. When do the parties feel it would
11:51AM 15   be appropriate to, depending upon all you expect to do, to have a
11:52AM 16   further status hearing in this case?
11:52AM 17   MR. PETERSON: Well, normally, as you know, Your Honor, an
11:52AM 18   effective status hearing could be after discovery because at that
11:52AM 19   point, all the issues would have been fleshed out; we would have
11:52AM 20   by that point had a decision with regard to our motion to remand
11:52AM 21   clearly at that point.
11:52AM 22   THE COURT: Well, you won't engage, as I understand it, in
11:52AM 23   discovery until the Court has ruled on the issue of the remand?
11:52AM 24   MR. PETERSON: That is correct, Your Honor.
11:52AM 25   THE COURT: All right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

32

11:52AM 1    MR. PETERSON: So I would imagine in this case, some time
11:53AM 2    after -- if the Court rules on -- when the Court rules on that
11:53AM 3    motion, perhaps a status conference would be set some time after
11:53AM 4    that.
11:53AM 5    THE COURT: All right. Counsel have anything else?
11:53AM 6    MR. JOCKE: No, sir.
11:53AM 7    MR. PETERSON: No.
11:53AM 8    THE COURT: All right. Thank you, counsel. It's been
11:53AM 9    very helpful for us to hear from you to have a better feel for
11:53AM 10   the case.
11:53AM 11   Counsel for the plaintiff, I understand you came down from
11:53AM 12   Ohio?
11:53AM 13   MR. JOCKE: Yes.
11:53AM 14   THE COURT: Is it as cold there as it is here?
11:53AM 15   MR. JOCKE: And colder and snowier.
11:53AM 16   THE COURT: What part of Ohio? Where is "Media"?
11:53AM 17   MR. JOCKE: Medina?
     18      THE COURT: Medina.
11:53AM 19   MR. JOCKE: It's near Akron.
11:53AM 20   THE COURT: It's where?
11:53AM 21   MR. JOCKE: It's near Akron.
11:53AM 22   THE COURT: Oh, okay. All right. Thank you, counsel.
11:53AM 23   ALL PARTIES PRESENT: Thank you, Your Honor.
     24      (Proceedings adjourned at 11:54 a.m.)
     25

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

```
                                              33
 1              CERTIFICATE

 2

 3         I, Scott L. Wallace, RDR-CRR, certify that the
    foregoing is a correct transcript from the record of proceedings
 4  in the above-entitled matter.

 5         ------------------------------
           Scott L. Wallace, RDR, CRR
 6         Official Court Reporter
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
              Scott L. Wallace, RDR, CRR
                Official Court Reporter
```

| 0 | C | M | U |
|---|---|---|---|
| 05-1796 [1] - 1:3 | Ca [1] - 1:3<br>Columbia [1] - 1:1<br>computer [1] - 1:25<br>computer-aided [1] - 1:25<br>Conference [1] - 1:7<br>Court [3] - 1:1, 1:21, 1:22<br>Courthouse [1] - 1:22<br>Crr [1] - 1:21 | machine [1] - 1:25<br>Madison [1] - 1:16<br>Medina [1] - 1:12 | United [3] - 1:1, 1:8, 1:18 |
| **1** | | **N** | **V** |
| 11:00 [1] - 1:6 | | North [1] - 1:19<br>Nw [1] - 1:19 | Va [1] - 1:17 |
| **2** | | | **W** |
| 20 [1] - 1:6<br>20001 [1] - 1:23<br>2005 [1] - 1:6<br>202.326.0566 [1] - 1:23<br>20530 [1] - 1:20<br>22314 [1] - 1:17<br>231 [1] - 1:12 | | **O**<br>Office [3] - 1:14, 1:14, 1:18<br>Official [1] - 1:22 | Walker [2] - 1:10, 1:11<br>Wallace [1] - 1:21<br>Washington [3] - 1:5, 1:20, 1:23<br>West [1] - 1:16<br>William [1] - 1:15 |
| | **D** | **P** | |
| | Dc [3] - 1:5, 1:20, 1:23<br>December [1] - 1:6<br>Defendant [2] - 1:6, 1:14<br>District [3] - 1:1, 1:1, 1:8<br>Docket [1] - 1:3<br>Dudas [1] - 1:5<br>Dulany [1] - 1:16 | Patent [1] - 1:14<br>Patricia [1] - 1:11<br>Penn [1] - 1:8<br>Peterson [1] - 1:19<br>Plaintiff [2] - 1:3, 1:10<br>Proceedings [1] - 1:25<br>produced [1] - 1:25<br>Putman [1] - 1:2 | |
| **3** | | | |
| 330.721.0000 [1] - 1:13 | | | |
| **4** | | | |
| 44256 [1] - 1:12 | **E** | | |
| **5** | Esq [4] - 1:11, 1:11, 1:15, 1:15 | **R** | |
| 555 [1] - 1:19<br>571.272.9035 [1] - 1:17 | **G** | Ralph [1] - 1:11<br>Rdr [1] - 1:21<br>reported [1] - 1:25<br>Reporter [2] - 1:21, 1:22<br>Room [1] - 1:22 | |
| **6** | Garrett [1] - 1:8<br>Gregory [1] - 1:19 | | |
| 600 [1] - 1:16<br>6814 [1] - 1:22 | **H** | | |
| **8** | Harold [1] - 1:2<br>Heather [1] - 1:15<br>Honorable [1] - 1:8 | **S** | |
| 8c43-a [1] - 1:16 | | Scott [1] - 1:21<br>shorthand [1] - 1:25<br>Solicitor [1] - 1:14<br>States [3] - 1:1, 1:8, 1:18<br>Status [1] - 1:7<br>Street [1] - 1:19<br>street [1] - 1:16 | |
| **A** | **I** | | |
| aided [1] - 1:25<br>Alexandria [1] - 1:17<br>Appearances [1] - 1:10<br>Attorney's [1] - 1:18<br>Ausa [1] - 1:19<br>Auyang [1] - 1:15 | Initial [1] - 1:7 | | |
| | **J** | | |
| | Jocke [2] - 1:10, 1:11<br>John [1] - 1:8<br>Jonathan [1] - 1:5<br>Judge [1] - 1:8 | **T** | |
| **B** | | Trademark [1] - 1:14<br>transcript [1] - 1:25<br>Transcript [1] - 1:7<br>transcription [1] - 1:25 | |
| Benton [1] - 1:19<br>Broadway [1] - 1:12 | **L** | | |
| | Lamarca [1] - 1:15 | | |