

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 09/233,249 | 01/19/99 | PUTMAN | H  D-1086 |

| EXAMINER |
|---|
| CARLSON, T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2162 | 6 |

028995
RALPH E. JOCKE
231 SOUTH BROADWAY
MEDINA OH 44256

WM01/1019

DATE MAILED:

10/19/01

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

PTO-90C (Rev. 2/95)
*U.S. GPO: 2000-473-000/44602

1- File Copy

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 09/233,249 | PUTMAN, HAROLD V. |
| | Examiner | Art Unit |
| | Jeffrey D. Carlson | 2162 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _3_ MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on _07 August 2001_.
2a) ☒ This action is **FINAL**.   2b) ☐ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) _1-56_ is/are pending in the application.
   4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☒ Claim(s) _1-56_ is/are rejected.
7) ☐ Claim(s) _____ is/are objected to.
8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.
10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
11) ☐ The proposed drawing correction filed on _____ is: a) ☐ approved b) ☐ disapproved by the Examiner.
    If approved, corrected drawings are required in reply to this Office action.
12) ☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. §§ 119 and 120**

13) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a) ☐ All  b) ☐ Some *  c) ☐ None of:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.
14) ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).
    a) ☐ The translation of the foreign language provisional application has been received.
15) ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO-1449) Paper No(s) _____.
4) ☐ Interview Summary (PTO-413) Paper No(s). _____.
5) ☐ Notice of Informal Patent Application (PTO-152)
6) ☐ Other: _____

Application/Control Number: 09/233,249 Page 2
Art Unit: 2162

## DETAILED ACTION

This action is responsive to the paper(s) filed 8/7/01.

1. The amendment filed 8/7/01 is objected to under 35 U.S.C. 132 because it introduces new matter into the disclosure. 35 U.S.C. 132 states that no amendment shall introduce new matter into the disclosure of the invention. The added material which is not supported by the original disclosure is as follows: The Examiner cannot locate original disclosure supporting the features of claims 45 of 47 whereby a computer provides two different screen elements that are selectable with two different input devices.

Applicant is required to cancel the new matter in the reply to this Office Action.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

1. Claims 21, 22 and 41 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

- Claims 21 and 22 cannot be fully understood due to the nature of "the output indicative instruction is operative to indicate a value associated with at least one element" and "cause the first transaction function device to operate responsive to the event and the value". Applicant's example on page 18 lines

Application/Control Number: 09/233,249                                             Page 3
Art Unit: 2162

5-8 describes enabling/disabling interface elements, not causing the function device (cash dispenser) to operate responsive to a value.

### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

Claims 31-34 are rejected under 35 U.S.C. 102(b) as being anticipated by Bosak (XML, Java, and the future of the web). Bosak teaches the basics of xml and style sheets. Xml documents provide the code for clients (internet-connected computers with browsers) to display a page/interface. The xml documents merely specify the content of the screen/interface/page, leaving the particular formatting/screen arrangement to the data from the style sheets. This enables a single xml document to determine the same content, yet be displayed/rendered differently on various different output devices such as screens and paper printing via the style sheets. A web browser that renders any xml document with clickable links, selectable fields, buttons, etc is taken to inherently provide an interface output. Also, the web connected computers required for xml viewing are taken to inherently include standard input devices such as keyboards and mouse - Bosak also describes "clicking". Mere button clicking triggers an event which causes at the very least, the button to be re-drawn on the interface

screen as indented or "pushed-in" while it is being clicked. This "event processing" is provided inherently by standard browsers; the programming (event processor) for it packaged with the browser.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Claims 12-22, 28-30, 41 and 43 are rejected under 35 U.S.C. 103(a) as being unpatentable over Bosak. It would have been obvious to one of ordinary skill at the time of the invention to have provided standard printers and driver software with the types of computers described by Bosak so that users could make printouts of the various screens. A standard printer is taken to meet applicant's "transaction function device" of these claims; a print job can be sent to the printer using different input means such as with a mouse or with a keyboard as is well known, relying on an input device to trigger a print event handled by known print event processors (print drivers) in software [claim 20]. Any software, including print driver software is taken to be an instruction document. As best understood regarding claims 21 and 41, it is well known for printer driver software to provide an interface to capture/specify the user's input regarding desired print parameters (# copies for example) and to present on-screen elements to the user indicating a print job has started. It would have been obvious to one of ordinary skill at

the time of the invention to have employed such printer driver features to enable the web clients of Bosak to print screens/information. Further, web-connected kiosks are well known to include touch screens. It would have been obvious to one of ordinary skill at the time of the invention to have employed any well known input devices such as touch screens; such are capable of processing Bosak's xml documents. The distributed clients' software (browser) that interprets the documents described by Bosak allow processing of the xml documents to be platform independent as described within [pg 5, #2]. Providing a second computer with a different operating system to process the same xml documents is suggested by Bosak [pg 6 "it is independent of any platform, vendor or application, so it can be used to exchange solution information without regard to the system its coming from or going to]. To have provided different monitor types and/or sizes would have been obvious for the various disparate network-connected end users as is well known; the thrust of Bosak is to provide programming that can be consumed by different users with different machine types and operating systems. Regarding the character based vs. graphical displays, standard monitor screens display pixels, whether representing characters or graphics. A well known and standard graphical display is also taken to be a character display device, depending on the screen contents to be rendered.

Claims 1-11, 23-27, 33-40, 42 and 44 are rejected under 35 U.S.C. 103(a) as being unpatentable over Rivett-Carnac (An Object-Oriented Framework for Transaction Capture Using Co-operating Business Rule Components) in view of Bosak. Rivett-

Application/Control Number: 09/233,249                                                                 Page 6
Art Unit: 2162

Carnac teaches a framework for transaction processing systems for a bank where the user interface is decoupled from the business logic. This allows the business rules to be developed and/or changed independent of the GUI. The framework includes interface objects such as transaction fields that are coupled to business rules for validations. When the user interacts with the system via the input device(s), events are triggered which change stored values and which also changes the interface display. "This requires framework mechanisms for notification of changes to fields entered by the user, triggering of rule processing to validate the entry and recalculate dependant data, updating the GUI display and informing the user of any warnings or errors which may arise" [section 3.2]. It would have been obvious to one of ordinary skill at the time of the invention to have included operable action menus as part of the interface as these are well known GUI techniques that end users would be comfortable with. Section 3.1 describes that the various rules may be modularly implemented via library functions (DLL/subroutines). Page 133 describes when an attribute's value is changed by a user (via input device), an event is triggered (change warning) which is handled by an event handler (event processor). The GUI is described on page 134 as being flexible and independent of end user platform. It would have been obvious to one of ordinary skill at the time of the invention to have provided such a banking transaction system with xml and style sheets as described by Bosak so that the data handling and transaction logic can be constructed without regard to output/interface, relying on style sheets to define the arrangement of the xml content. This would enable various different end user machines to access the system without requiring redesign specific to

Application/Control Number: 09/233,249　　　　　　　　　　　　　　　　　　Page 7
Art Unit: 2162

the end user hardware. Such an approach would be obvious for an ATM cash dispensing machine so that many geographically dispersed machines (end users) can access the financial transaction system over a controlled network. The user input would trigger an event processor to operate the cash dispenser.

　　　Claims 45-49 and 51 are rejected under 35 U.S.C. 103(a) as being unpatentable over Zeanah et al (US5933816). Zeanah et al teaches a system and method of delivering financial services and transactions to various remote devices, by using modular service sets. Zeanah et al recognizes an old problem where interfaces between different types of remote devices and the bank's central computer had to be developed separately, depending on the device. Zeanah et al provides interfaces whereby the screen content in separated from screen format to enable a presentation manager to provide different screens for each particular device [col 4 lines 1-6]. Column 13 lines 20-23 describe the mini-app dialog component which manages the business functions (funds xfer, bill payment, etc). It is "responsible for the content of information on pages (screens) and the flow of customer interaction, but preferably not the style and layout of the presentation." Style templates (style sheets) are used to generate various screens for PDAs, PCs, ATM, etc [col 7 lines 30-33]. The mini-app component instantiates and calls transaction executor components 91 to do transactions with external service providers and also operates remote devices, such as cash dispensers [col 13 lines 52-55]. The touch point and display set 30 provides the actual customer display and input facility. This set displays pages on the screen and

Application/Control Number: 09/233,249                                                Page 8
Art Unit: 2162

sends customer input (choice selections) to the delivery system 12. It preferably comprises a browser. See column 6 lines 18-57. The presentation manager component 52 maps the screen info into a specific style layout in a device-specific presentation format (CAT=ATM, kiosk, phone screen, PDA, etc). Style templates are also used.[col 7 lines 24-42]. The navigation shell component 82 informs the customer of the choices (mini-apps) that are available, based on the customer's relationship and business rules [col 12 lines 41-45, 58-60]. As can be seen, the interface software calls various modular software components according to captured user input. The peripheral device services set is responsible for handling application requests for peripheral device services and for managing the software components that handle such requests[ col 7 lines 62-67]. The peripheral device handler component 61 comprises a plurality of handlers, with each providing a generic device management interface and a specific service interface [col 8 lines 1-13]. The modular nature of the system allows creation and testing of each component separately. Thus, any computer can use the same universal central application and request/call specific software components (event processors) to carry out the requested function such as user validation or cash dispensing.

Applicant's "instruction document" is taken to read on any program or collection of code, whether in a module, exe, dll, or simply a section of code in a longer program. Regarding claim 45 as best understood, it would have been obvious to one of ordinary skill at the time of the invention to have provided various types of input hardware such as keypads and/or touch screens to capture user information/requests. It would have

Application/Control Number: 09/233,249                                                              Page 9
Art Unit: 2162

been obvious to one of ordinary skill at the time of the invention to have called the event processor to generate the interface screen using the style templates specific to the selected/enabled input device. Regarding claim 47, Zeanah et al teaches various user interface data capture elements such as fields, choices, etc. It would have been obvious to one of ordinary skill at the time of the invention to have operated the mentioned cash dispenser responsive to one selectable screen element and to activate a deposit mechanism or receipt printer responsive to another.

Claims 50 and 52-56 are rejected under 35 U.S.C. 103(a) as being unpatentable over Zeanah et al in view of Bosak. Zeanah et al does not teach XML. It would have been obvious to one of ordinary skill at the time of the invention to have employed XML document instructions/tags/programming to carry out the software elements of Zeanah et al. This would enable Zeanah et al to take advantage of the machine/OS independent nature of XML programming. Regarding claim 52, it would have been obvious to one of ordinary skill at the time of the invention to have provided code sections/pages/modules/documents in XML to render each type of screen required. It is well known and would have been obvious to one of ordinary skill at the time of the invention to have delineated such programming code with delineating tags.

### *Response to Arguments*

2.     Applicant's arguments filed 8/7/01 have been fully considered but they are not persuasive.

Application/Control Number: 09/233,249 Page 10
Art Unit: 2162

Bosak is prior art. Using Netscape's "Page Info" feature indicates a posting (and therefore, publication) date of 3/10/1997. As an exercise, the examiner posted an old html file (last saved 2/20/01) from his hard drive to the internet on 10/10/01. Netscape's Page Info feature indicates a "Last Modified" date of 10/10/01; this is taken as the posting/publication date. See attached supporting printouts.

Applicant's arguments that the applied art does not teach an ATM is not convincing. First, the previous claims do no call for an ATM. Second, the claims mention only an "automated transaction machine" in the preamble, but do not positively require a teller machine or bank machine in the body of the claims. Further still, applicant's definition [pg 1 lines 19-20] of automated transaction machine calls for only a device which carries out transactions, including transfers of value. This definition is not believed to exclude automated transactions "without value" or "of low value". Nonetheless, "value" in this definition is quite broad and does not require currency. Computer instructions when processed can be taken to be "transactions"; a processor which carries out instructions is be taken to be an automated transaction machine.

Regarding Examiner's assertions of well known features obvious to include with the teachings, applicant has pointed to MPEP section which in fact give the Examiner the ability to make such a rejection. Applicant's statement that a rejection cannot be made based on a "well known" assertion absent a showing that all features are disclosed in the applied reference(s) [pg 20 lines 4-6] are neither persuasive nor taken to be a seasonable traversal of Official Notice.

Application/Control Number: 09/233,249                                                    Page 11
Art Unit: 2162

### Conclusion

3.  Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action. In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the date of this final action.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Jeffrey D. Carlson whose telephone number is 703-308-3402. The examiner can normally be reached on 8:30-6p, off on alternate Fridays.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Eric Stamber can be reached on 703-305-8469. The fax phone numbers for the organization where this application or proceeding is assigned are 703-308-6306 for regular communications and 703-308-6306 for After Final communications.

Application/Control Number: 09/233,249    Page 12
Art Unit: 2162

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the receptionist whose telephone number is 703-305-3900.

*[signature]*

Jeffrey D. Carlson
Examiner
Art Unit 2162

jdc
October 17, 2001