# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**GILBERT P. HYATT,**

                   **Plaintiff,**

      **v.**

**JON W. DUDAS, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,**

              **Defendant.**

**Civil Action 03-0901 (HHK)**

## MEMORANDUM OPINION

Plaintiff, Gilbert P. Hyatt ("Hyatt"), brings this action against defendant, Jon W. Dudas,[1]

in his official capacity as Director of the United States Patent and Trademark Office ("PTO"),

seeking review of the decision of the Board of Patent Appeals and Interferences ("Board") to

affirm the rejection of 79 of the 117 claims in Hyatt's patent application.  Before the court are the

parties' cross-motions for summary judgment [## 23, 24].  Upon consideration of the motions,

the respective oppositions thereto, and the record of this case, the court concludes that the PTO's

motion for summary judgment must be granted, and Hyatt's partial motion for summary

judgment must be denied as moot.

---

[1]    Jon Dudas became the Director of the United States Patent and Trademark Office in 2004.  When Hyatt initially filed his complaint on April 16, 2003, James Rogan held this position.  Pursuant to FED. R. CIV. P. 25(d)(1), the court has substituted Dudas for Rogan as the defendant in this lawsuit.

# I. BACKGROUND

## A. Legal Background

### 1. Patent Applications

An inventor seeking to obtain a patent must file a specification of the purported invention with the PTO.  37 C.F.R. § 1.51(b)(1).  A specification must include, inter alia, both a written description of the invention and an enablement for a claimed invention which explains the "manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same. . . ."  35 U.S.C. § 112 para. 1; *see also* 37 C.F.R. § 1.71(a).

To fulfill the written description requirement, a patent applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession *of the invention*."  *Vas-Cath*, *Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991).  That is, a description need not describe exactly what that applicant claims as her invention, but it must convey to one with "ordinary skill in the art" that the applicant invented what is claimed.  *See Union Oil Co. of Cal. v. ARCO*, 208 F.3d 989, 997 (Fed. Cir. 2000).  A disclosure may meet this burden by providing either "express" or "inherent" support for a claimed limitation.  *See Tronzo v. Biomet*, *Inc*., 156 F.3d 1154, 1159 (Fed. Cir. 1998).  In order for a disclosure to be inherent, the "missing descriptive matter must necessarily be present in the . . . application's specification such that one skilled in the art would recognize such a disclosure." *Id*.

To fulfill the enablement requirement, "a patent application must adequately disclose the claimed invention so as to enable a person skilled in the art to practice the invention at the time

2

the application was filed without undue experimentation." *In re Swartz*, 232 F.3d 862, 863 (Fed. Cir. 2000) (internal citation omitted). "[A]'reasonable' amount of routine experimentation," is allowed but "such experimentation must not be 'undue.'" *Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1371 (Fed. Cir. 1999). In addition, "[w]hether claims are sufficiently enabled by a disclosure in a specification is determined as of the date that the patent application was first filed." *Id.*

At the end of the written description and enablement, a proper specification should conclude with a list of "claims," which identify the specific innovations, components or sub-parts of invention, the applicant regards as hers. 35 U.S.C. § 112 para 2. A claim is a single sentence description, usually divided into several paragraphs, of what an applicant believes to be her invention, setting the boundaries of the invention the applicant wishes the PTO to examine. Specifically, a single claim can be composed of multiple elements and/or limitations. Elements are the previously known physical components that make up the claimed invention. Limitations, on the other hand, usually describe the claim's restrictions, the interaction between or features of the claim's elements. An application may contain several claims, and each claim usually contains several limitations. In addition, several claims in a single application may share some of the same limitations. As a result, the PTO may reject several claims at once by rejecting a single, shared limitation.

## 2. Patent Process and Review

After an inventor files her application, which typically includes a specification, drawings, and sets of claims, to the PTO, the PTO submits the application to an Examiner with the necessary technical competence. *In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003). After

3

examining the application, the Examiner sends the applicant an "Office action" which may grant or reject the claims.  37 C.F.R § 1.104(a)(2).  The applicant may respond by submitting, in writing, a reply that "distinctly and specifically points out the supposed errors in the examiner's action and must reply to every ground of objection and rejection in the prior Office action." *Id.* § 1.111(b).  "A general allegation that the claims define a patentable invention without specifically pointing out how the language of the claims patentably distinguishes them from the references does not comply with the requirements of this section." *Id.*  If and when the Examiner and applicant finally cannot agree on the disposition of certain claims, the Examiner issues a Final Office Action.  *Id.* § 1.113.  The applicant then may appeal to the Board, made up of a panel of three administrative patent judges ("APJs"), which will either sustain or reverse the Examiner's rejections.  35 U.S.C. § 134(a).  If the Board sustains the Examiner's rejections, the applicant may appeal to the Federal Circuit under 35 U.S.C. §141, or she may bring a civil action to overturn the Board's decision in this court under 35 U.S.C. §145.

## B.  Factual Background

Hyatt is an electrical engineer who holds various computer hardware and software patents.  The application at issue is U.S. Patent Application Serial No. 08/471,702 ("'702 Application" or "'702"), entitled "Improved Memory Architecture Having A Multiple Buffer Output Arrangement," which relates to a computerized display system for processing images. R3, 1584.

On June 6, 1995, Hyatt filed the '702 Application, which included a 238-page specification, 40 pages of drawings, and 15 claimed inventions.  R1-347.  After several amendments, Hyatt presented 117 claims for examination.  Hyatt's specification indicates that

4

the '702 application is part of a continuation of ancestor patents dating back to 1984.  R4.  The specification lists certain computer components, including a graphics processor, a register interface, a buffer memory, and a post-processor.  The specification describes certain techniques, such as spatial filtering for anti-aliasing, and some software programs.  *See* R1599-1600.

The Examiner rejected all 117 claims on various grounds.  *See* R638-63.  The Board affirmed the Examiner's rejections of 79 of Hyatt's claims[2] and overturned other rejections, which are not part of the present action.  *See* R1583-1640.  The Board affirmed the rejection of each of the 79 claims for lack of written description and/or lack of enablement.  R1639.  On April 16, 2003, Hyatt filed a complaint in this court pursuant to 35 U.S.C. § 145.

## II. ANALYSIS

### A. Procedural issues

The PTO brings a motion for summary judgment, and Hyatt brings a motion for partial summary judgment, under FED. R. CIV. P. 56.[3]  The parties, however, dispute several threshold issues of law which this court  must resolve before turning to the merits of the motions. in this case.  Specifically, the court must determine: (1) the deference, if any, owed to the decision of the Board in a district court review under Section 145; (2) the value of inventor testimony or

---

[2] The Board upheld the rejection of claims 1-14, 17, 18, 20, 34, 36, 42-45, 81, 85, 98, 106-114, 116, 119-134, 136, 141, 143, 145-48, and 153-72 for lack of written description and lack of enablement.  R1639.

[3] Under FED. R. CIV. P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

5

declarations as evidence; and (3) the application of the administrative exhaustion requirement to certain arguments in this case. The court examines each in turn.

### 1. Standard of Review – Section 145

The parties disagree over the court's standard of review of the Board's decision to reject Hyatt's patent application. The PTO argues that in a case under 35 U.S.C. § 145, all of the Board's fact-findings are entitled to "substantial evidence" deference, whether or not the patent applicant introduces new evidence as Section 145 allows her to do. Hyatt, on the other hand, contends that the Board's fact-findings are reviewed *de novo* if additional evidence is submitted that rebuts those findings. Hyatt is correct.

Section 145 provides that the district court "may adjudge that such applicant is entitled to receive a patent for an invention, as specified in any of his claims involved in the decision of the [Board]." 35 U.S.C. § 145. The Federal Circuit recognized that Section 145 is, in essence, a type of review of administrative action, and therefore the district court must employ a "standard of review for error in [an] agency decision." *Fregeau v. Mossinghoff*, 776 F.2d 1034, 1038 (Fed. Cir. 1985). As a result, a district court normally applies the deferential "substantial evidence" standard to the Board's fact-findings. *Mazzari v. Rogan*, 323 F.3d 1000, 1004-05 (Fed. Cir. 2003) (citing *Dickinson v. Zurko*, 527 U.S. 150 (1999)) (holding that the Administrative Procedure Act, 5 U.S.C. § 706, applies to a court's review of PTO decisions). However, section 145 is not merely a form of administrative review. The statute allows the parties to submit new evidence to be considered by the court in addition to the administrative record before the Examiner and the Board. *See Fregeau*, 776 F.2d at 1037 ("The proceeding [under Section 145], however, is not simply an appeal since the parties are entitled to submit additional evidence.");

6

*Mazzari*, 323 F.3d at 1004 (holding that section 145 "affords the applicant an opportunity to present additional evidence or argue the previous evidence afresh, either by simply relying upon the record below or by reintroducing the same evidence through alternative means such as live testimony"). If new evidence is submitted, "the district court takes on the role of fact-finder and may need to make factual findings." *Id.* Proceedings under Section 145 have therefore been described as "a hybrid of an appeal and a trial de novo." *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1345 (Fed. Cir. 2000) (citing *Estee Lauder Inc. v. L'Oreal, S.A.,* 129 F.3d 588, 592 (Fed. Cir. 1997)). This is because the district court "applies the 'substantial evidence' standard of review to findings of fact made by the board," but it makes "de novo factual findings" if the parties present additional conflicting evidence. *Mazzari*, 323 F.3d at 1005. Therefore, the court reviews the Board's fact-findings *de novo* to the extent that Hyatt presents new evidence that challenges particular findings; otherwise, when no such evidence is presented, the court employs a deferential "substantial evidence" standard.

### 2. Admissibility of Hyatt's Declaration

Hyatt presents a declaration which refutes the Board's various written description rejections. *See generally* R832. Such a declaration would entitle Hyatt to *de novo* review of every fact-finding of the Board he challenged. *Mazzari,* 323 F.3d at 1005. However, the PTO argues that despite Hyatt's apparent entitlement to submit new evidence under Section 145, the court should not consider Hyatt's declaration–causing the Board's fact-findings to be reviewed under a deferential standard–for two reasons. First, the PTO argues that the declaration of a patent applicant in his own case is not entitled to any weight. Second, the PTO contends that Hyatt's declaration should not be considered because he does not explain his failure to submit the

declaration in previous proceedings before the Board.  The court considers both arguments in

turn and ultimately concludes that it cannot consider Hyatt's declaration.

a.  *Validity of Inventor Testimony*

The PTO argues that the court should not consider Hyatt's declaration because "the bald

declaration of an inventor is insufficient to overcome the Board's findings."  Def.'s Reply to Pl.'s

Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply") at 11 (citing *Bell & Howell Document Mgmt.*

*Prods. Co. v. Altek Sys*., 132 F.3d 701, 706 (Fed. Cir. 1997); *Roton Barrier*, *Inc. v. Stanley*

*Works*, 79 F.3d 1112, 1126 (Fed. Cir. 1996)).  The PTO is incorrect because it mis-reads the law.

A court may not consider an inventor's declaration in disputes involving claim

construction, which by definition only takes place *after* a patent has been granted.  *See Bell &*

*Howell*, 132 F.3d at 706 (noting that, in claim construction, after-the-fact inventor declarations

must be disregarded because "the claims, specification, and file history, rather than extrinsic

evidence, constitute the public record of the patentee's claim, a record on which the public is

entitled to rely") (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir.

1996)); *Roton Barrier*, 79 F.3d at 1125-26 (disregarding inventor declaration in resolving dispute

over claim construction in infringement case).  By contrast, it is well-established that *before* a

patent has been granted, an inventor's testimony may be used to determine whether claims meet

the written description requirement.  *See Solomon v. Kimberly-Clark Corp*., 216 F.3d 1372, 1378

(Fed. Cir. 2000) ("[I]n the more fluid environment of patent examination, an inventor's

statements are relevant to determining compliance with the statute."); *see also id*. ("It is not

inappropriate for the PTO *or a reviewing tribunal* to consider such evidence extrinsic to the

patent application in light of the goals of the examination process and the fact that pending

8

claims can be freely amended to comport with those goals.") (emphasis added) (citing *In re Zletz*, 893 F.2d 319, 321-22 (Fed. Cir. 1989)). The court, therefore, will not refuse to consider Hyatt's declaration simply because it is his own self-serving testimony.

     *b.  Failure to Submit Declaration in Previous Proceedings*

     The PTO argues that the court should not consider Hyatt's declaration because he failed to present it in the proceedings before the Examiner and the Board. The merits of this argument in turn rests on the validity  rests of two other assertions: first, that there are limitations to a party's entitlement to submit new evidence under Section 145 and, second, that under these limitations, Hyatt is not entitled to submit his declaration. The court agrees with the PTO on both counts.

     First, while Hyatt argues that there are no restrictions to submitting new evidence under Section 145, courts in the District of Columbia have established a doctrine limiting this entitlement. The courts in such actions refuse to admit evidence submitted to support "new" arguments–that is, those not raised before the Examiner or the Board. *DeSeversky v. Brenner*, 424 F.2d 857, 858 (D.C. Cir. 1970) (stating that though an applicant may present new evidence, she is "precluded from presenting new issues, at least in the absence of some reason of justice put forward for failure to present the issue to the Patent Office"); *see also In re Watts*, 354 F.3d 1362, 1367 (Fed. Cir. 2004) ("[I]t is important that the applicant challenging a decision not be permitted to raise arguments on appeal that were not presented to the Board."). In addition, courts have excluded new evidence in Section 145 actions if it was "available to the parties, but was withheld from the Patent Office as a result of fraud, bad faith, or gross negligence." *Monsanto Co. v. Kamp*, 269 F. Supp. 818, 822 (D.D.C. 1967); *accord Cal. Research Corp. v.*

*Ladd*, 356 F.2d 813, 820-21 n.18 (D.C. Cir. 1966) ("Although each side 'may strengthen its case with additional material' the plaintiff may not submit for the first time evidence which he was negligent in failing to submit to the Patent Office . . . ."); *Holloway v. Quigg*, 9 U.S.P.Q.2d 1751, 1752 (D.D.C. 1988) ("[E]vidence has been excluded if it was available to the plaintiff during the PTO proceeding but was either intentionally or negligently withheld."). Both doctrines support the "general policy of encouraging full disclosure to administrative tribunals." *Ladd*, 356 F.2d at 820-21 n.18 ("In short, the District Court proceeding may not be conducted in disregard of the general policy of encouraging full disclosure to administrative tribunals . . . ."). Consequently, these doctrines limit Hyatt's entitlement to submit new evidence under Section 145.[4]

Second, the PTO argues that under these doctrines, Hyatt should be barred from submitting his declaration. Specifically, the PTO contends that Hyatt is at least negligent in failing to provide the declaration in earlier proceedings. Def.'s Mot. for Summ. J. ("Def.'s

---

[4] The Federal Circuit, which provides the controlling law in this case, has neither accepted nor repudiated cases, such as *DeSeversky* or *Kamp*, limiting the entitlement to submit new evidence in Section 145 actions. Nevertheless, the PTO has adopted these guidelines, citing explicitly to D.C. Circuit and D.C. district court cases:

> In an action under 35 U.S.C. [§] 145, the plaintiff may introduce evidence not previously presented to the U.S. Patent and Trademark Office. However, plaintiff will be precluded from presenting new issues, at least in the absence of some reason of justice put forward for failure to present the issue to the U.S. Patent and Trademark Office. [Citations to *DeSeversky*, 424 F.2d at 858; *MacKay*, 641 F. Supp. at 570]. Furthermore, new evidence is not admissible in district court where it was available to the parties but was withheld from the U.S. Patent and Trademark Office as a result of fraud, bad faith, or gross negligence. [Citations to *DeSeversky*, 424 F.2d at 858 n.5; *Ladd*, 356 F.2d at 821 n.18; *MacKay*, 641 F. Supp. at 570; *Kamp*, 269 F. Supp. at 822; *Killian v. Watson*, 121 U.S.P.Q. 507, 507 (D.D.C. 1958)].

MANUAL ON PATENT EXAMINING PROC. § 1216.02.

10

Mot.") at 37. Hyatt, on the other hand, justifies submitting his declaration because he had no opportunity to respond to the Board's new grounds for upholding the Examiner's written description rejections. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 41-44. The PTO's position has merit and Hyatt's does not.

A patent applicant must have the opportunity to respond to new grounds for claim rejections put forth by the Board. *See In re Waymouth*, 486 F.2d 1058, 1061 (CCPA 1973) ("To attempt to deny appellants an opportunity to provide a different and appropriate response to the board's rejection . . . does not satisfy the administrative due process established by Rule 196(b) of the Patent Office."). If the Board provides a "wholly different basis" for sustaining a rejection, the rejection is new. *Id.* at 1060-61 (finding that the Board had sustained a rejection on a "wholly different basis" and had conceded as much by admitting that its comments "were merely 'an additional reason' for affirming the examiner's rejection"). However, a rejection is not based on new grounds if "appellants have had fair opportunity to react to the thrust of the rejection." *In re Kronig*, 539 F.2d 1300, 1302 (CCPA 1976); *accord id.* at 1303 (finding that an applicant had fair opportunity to challenge a rejection because "[t]he basic thrust of the rejection at the examiner and board level was the same").

Hyatt faults the Board for not directly quoting the Examiner's written description rejections. *See*, *e.g.*, Pl.'s Opp'n at 18 ("The PTO's failure to quote the precise language used by the Examiner is telling."). By this logic, the Board could only avoid raising a new grounds of rejection by using the exact words the Examiner used to sustain a written description rejection. Though a patent applicant is entitled to respond to the "thrust of the rejection," *Kronig*, 539 F.2d at 1302, not every new turn of phrase by the Board entitles a patent applicant to an additional

11

response.  A rejection is not new simply because the Board fails to use the exact words of the Examiner in sustaining a rejection or if the Board simply elaborates on the Examiner's rationale. *In re Oetiker*, 977 F.2d 1443, 1445-46 (Fed. Cir. 1992).

After closely comparing the Examiner's rejections with the Board's rejections,[5] the court concludes that the "thrust" of the Board's written description rejections are the same as those of the Examiner.[6]  With regard to each limitation rejected for lack of written description, the Examiner identified the specific limitation using a short phrase,[7] and explained simply that that

---

[5]    *Compare* R642-43 (Examiner's rejection of written description of vector processor) *with* R1605-07 (Board's sustaining same written description rejection); *compare* R643-44 *with* R1608-09 (processor responsive to an accessed block of video pixel image information); *compare* R647 *with* R1613-14 (rejections of block processor generating two dimensional processed image information); *compare* R651 *with* R1615-16 (rejections of block boundary smoothing); *compare* R652 *with* R1617 (written description rejections video image date compression system); *compare* R653 *with* R1617-19 (written description rejections of weighting processor is a quantization weighting processor); *compare* R654 *with* R1620-21 (written description rejections of generating data compressed video information).

[6]    There is one exception.  For claims 153-172, "making a product in response to image information," the Examiner issued a rejection on the grounds that it was not described in Hyatt's specification.  R655.  Upon review, the Board went beyond simply elaborating on the Examiner's rejection or explaining its own attempts to find the "making a product" feature in the specification.  It found that the limitation produced "signals" and that, as a matter of law, "signals" were not "products."  R1621-1624.  However, the Board made this determination in response to Hyatt's argument in his appeal brief that a "product" could be a "signal."  R836-37.  It is therefore not a "new" grounds for rejection because Hyatt had and took the opportunity to argue his position.  In addition, in his opposition to the PTO's motion for summary judgment, Hyatt does not contend that the Board provided new grounds for rejection for these claims.  Pl.'s Opp'n at 39-40.

[7]  R642-43 ("vector processor responsive to an accessed block of video pixel image information and to vector information"); R643-44 ("processor responsive to an accessed block of video pixel image information"); R647 ("block processor responsive to an accessed block of pixel image information and to vector information"); R651 ("block boundary smoothing"); R652 ("video image data compression system"); R653 ("weighting processor is a quantization weighting processor"); R654 ("generating data compressed video information").

particular feature was not described in Hyatt's specification or a parent application (No. 06/662,211) cited by Hyatt.[8]

The Board reversed 38 of the Examiner's rejections based on lack of written description. R1639 (reversing Examiner's written description rejection of limitations common to claims 19, 22-25, 35, 37, 49-52, 82-84, 95-97, 99-105, 115, 117, 118, 135, 137-140, 142, 144, and 149-152 because the particular features were described in the specification). However, the Board sustained the remaining rejections using the same rationale–the claimed features were simply not described in Hyatt's specification.[9]

Mostly, the Board's rejections were longer than the Examiner's. The majority of the Examiner's written description rejections were one paragraph long, see, e.g., R642-43, while the Board at times took several pages to uphold the same rejections. *See*, *e.g.*, R1605-07. With some rejected written descriptions, the Board did not expand much on the Examiner's one

---

[8] Because the Examiner's rejections were terse--for these limitations, no more than a paragraph each--Hyatt claims that the Examiner did not meet his *prima facie* burden. The controlling law, however, indicates otherwise. If an Examiner simply cannot find a claimed limitation described in a specification, he is not required to say more than that to reject a claim for lack of written description. *In re Alton*, 76 F.3d 1168, 1175 (Fed. Cir. 1996) ("If the applicant claims embodiments of the invention that are completely outside the scope of the specification, then the examiner or Board need only establish this fact to make out a prima facie case.") (citing *In re Wertheim*, 541 F.2d 257, 263-64 (CCPA 1976)).

[9] *See* R1607 ("[W]e find no written description for a processor coupled to and performing the 'generating' function 'in response to' the vector information as well as 'in response to' image information from the image memory"); R1613 (citing R1607 and sustaining similar written description rejection); R1608 ("[W]e find no disclosure of the processor 'generating data compressed video image information,' as claimed"); R1609, R1617, R1620 (citing R1608 and sustaining similar written description rejections); R1616 ("We find nothing in the specification that describes 'smoothing' or 'block boundary smoothing.'"); R1619 ("[W]e fail to see how the program GRAPH.ASC, or the other programs LD.ASC or FTR.ASC, provide written description support for the limitation at issue.").

13

paragraph rejection, using only slightly different words to say that it could not find the claimed limitations in Hyatt's specification.  *See*, *e.g.*, R1608, R1609, R1617.  With other rejections, the Board described its attempts to find certain limitations in Hyatt's specification–for instance, by searching the specification for individual words or features in the limitation–and then noting that it still could not find written description support for the claimed limitation as a whole.[10]  In short, the Board showed that it made an independent and thorough assessment of Hyatt's specification before upholding the Examiner's written description rejections for certain limitations.  Furthermore, Hyatt already had a chance to respond to the "thrust" of the Examiner's written description rejections before his appeal to the board.  As a result, the court concludes that Hyatt's declaration, which addresses many of the written description rejections, could have been presented earlier, perhaps during Hyatt's proceedings before the Examiner, but certainly by the time his patent application was considered by the Board.[11]

---

[10] *See*, *e.g.*, R1605-07 (observing that, with regard to the "vector processor generating two dimensional vector processed image information" limitation, Hyatt's specification disclosed a processor, coupled to the accessing circuit and to the vector generator, but not one functioning "in response to" vector information and image information from the image memory);  R1615 (noting that, for the "block boundary smoothing" limitation, the Board knew what a "block boundary" was, and that a software program in Hyatt's specification included the word "smoothing," but that neither "smoothing" nor the combined phrase "block boundary smoothing" was otherwise described in the specification).

[11] Hyatt also argues that the Board improperly refused to consider his request for rehearing; however, if a patent applicant fails to present an argument in her appeal to the Board that could have been presented earlier, she may not present it in her request for rehearing. *Cooper v. Goldfarb*, 154 F.3d 1321, 1331 (Fed. Cir. 1998) ("A party cannot wait until after the Board has rendered an adverse decision and then present new arguments in a request for reconsideration.").  In Hyatt's request for rehearing, he presented 50 pages of new argument, which at last included detailed explanations addressing the Board's reasons for rejecting his claims.  R1648-98.  In addition, he submitted almost 100 pages of new photographs, drawings, and reference material that he also failed to present earlier to the Board.  R1699-1793.  The Board denied Hyatt's request for rehearing because his "extensive new arguments" could have

14

The court, therefore, excludes from its consideration Hyatt's declaration because: (1) the "thrust" of the Board's written description rejections were the same as the Examiner's; (2) Hyatt had the opportunity to present to the Board, if not the Examiner, his declaration indicating that one skilled in the art would recognize his claimed limitations as described in the specification for the '702 application; (3) Hyatt has no other explanation (aside from the "new grounds" argument) to address why he failed to offer his declaration during the proceedings before the Board; and (4) Hyatt's failure to explain why he didn't submit his declaration earlier is negligent, and the district court need not consider evidence negligently submitted after the end of administrative proceedings. *Killian*, 121 U.S.P.Q. at 509 ("Where a plaintiff in an action under Section 145 . . . offers no explanation for his failure to submit to the Patent Office, during the prosecution of his application for patent, evidence purporting to show that he invented the claimed subject matter prior to the effective filing date of the application on which a patent said to anticipate was granted, such evidence is not properly admissible."). As a result, the court finds that Hyatt's declaration is not admissible.

Because Hyatt offers no other additional evidence aside from his declaration, the court reviews all of the Board's fact-findings using the more deferential "substantial evidence" standard. *Mazzari*, 323 F.3d at 1004-05. Under this standard, the court "asks whether a reasonable fact-finder could have arrived at the agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000). The Board's findings are not rendered unsupported by substantial evidence simply because it is possible to draw "two inconsistent conclusions." *Velander v.*

---

been presented earlier. R1807. Upon review of Hyatt's request for rehearing, the court agrees. Hyatt has not offered any justifiable excuse for not submitting these arguments to the Board earlier. As such, Hyatt's request for rehearing was properly denied.

*Garner*, 348 F.3d. 1359, 1374 (Fed. Cir. 2003) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).  Therefore, "if the evidence of record will support several reasonable but contradictory conclusions, we will not find the Board's decision unsupported by substantial evidence because the Board chose one finding over another plausible alternative."  *Id.* (citing *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002)).

**B. The Board's Affirmation of the Examiner's Written Description Rejections**

Before the court for review are ten written descriptions, relating to seventy-nine claims, that were rejected by both the Examiner and the Board.  The rejections can be grouped into five categories.  The court considers each category in turn.

### 1.  Vector Processor and Block Processor

The Examiner rejected twenty-nine claims based on their common "vector processor"and "block processor" subparagraphs.[12]  R642-43, 647.  The Board upheld the rejections of the

___

[12]      An exemplary "vector processor" subparagraph for claims 1, 2, 5, 9, 10, 12, 20, 81, 85, 98, 110-114, 119, 120, 123, 127, 128, 130, 136, 153, 157, and 161 is set forth in claim 1:

> a two dimensional vector processor coupled to the accessing circuit and coupled to the vector generator, the two dimensional vector processor generating two dimensional vector processed image information in response to the accessed blocks of video pixel image information accessed by the accessing circuit and in response to the two dimensional vector information generated by the vector generator;

R1009-10.  An exemplary "block processor" subparagraph for claims 17, 18, 133, and 134 is set forth in claim 17:

> a two dimensional block processor coupled to the frame buffer accessing circuit and coupled to the vector generator, the two dimensional block processor generating two dimensional processed image information in response to the blocks of pixel image information accessed by the frame buffer accessing circuit and in response to the two dimensional vector information generated by the vector generator;

vector and block processor limitations because Hyatt did not adequately describe the processors specified in his claims.[13]  Specifically, the Board found that both limitations "require[] that the processor perform the function of 'generating two dimensional processed image information in response to . . . video pixel information . . . and in response to the two dimensional vector information generated by the vector generator.'"  R1606.  It determined that this language "implies that the 'generating' function operates on two kinds of input data: a pixel information from memory and vector information."  *Id.*  It found that "the specification describes graphics vectors being generated . . . into image memory . . . , <u>not</u> being generated and used by a processor together with accessed pixel data read out from the block image memory, which would require bypassing the block memory."  R1606-07.  In other words, "the disclosed processor only controls the vector generator, it does not receive data from it or operate 'in response to' it."  R1607.  The Board therefore concluded that "[s]ince the vector information is stored into the block memory, we find no written description for a processor coupled to and performing the 'generating' function 'in response to' the vector information as well as 'in response to' image information from the image memory."  *Id.*  In essence, the Board found that while Hyatt did describe a processor, he did not describe "one that receives or responds to the two particular kinds of information–video pixel information and vector information–specified in his claim."  Def.'s Reply at 16-17.

---

R1026-27.

[13]     The Board noted the similarity of the vector processor claims and the block processor claims and used the same reasoning in rejecting both limitations.  R1607, 1613-14; *see also* R642.

In his appeal to the Board, Hyatt presented one piece of evidence, Table 1, which identifies twenty-four words found in his claims and lists the number of times each one appears in his specification and the page number on which each is located.  R832.  It offers no explanation or response to the Examiner's rejections.  Both the Examiner and the Board found Table 1 unhelpful and unpersuasive, for "merely pointing to isolated words scattered throughout the specification does not describe the invention claimed as a combination of elements, functions, and interconnections any more than a dictionary provides written description support for a book where words are used in combination to provide a certain meaning."  R1595. With respect to the vector and block processor limitations, the Board stated that Hyatt "merely points to Table 1 . . . for occurrences of words in the limitation and does not show where the specification describes the claimed structure or process."  R1607.  Notably, Hyatt did "not point to a written description of a processor performing a generating function responsive to the two specific types of information."  *Id.*

It is well established that "the written description must include all of the limitations of the [claim], or the applicant must show that any absent text is necessarily comprehended in the description provided."  *Hyatt v. Boone*, 146 F.3d 1348, 1354 (Fed. Cir. 1998).  Because a reasonable fact-finder could have arrived at the Board's conclusion that Hyatt did not "include all of the limitations" of this claim because he did not describe a processor that responds to both video pixel information and vector information, the court finds that the Board's decision to uphold the vector and block processor rejections was supported by substantial evidence.[14]

---

[14]    In his opposition, Hyatt relies on his declaration to support his contention that "the processor recited in the claims is supported by the disclosure."  Pl.'s Opp'n at 19.  However, the court has already determined that it will not consider Hyatt's declaration in deciding this motion

## 2.  Processor Generating Data Compressed Video

The Board upheld the Examiner's rejection of fifty-two claims based on their common "data compression" subparagraphs because Hyatt again did not describe his claimed inventions in his specification.[15]  The Board found that "[w]hile a processor is coupled to the accessing circuit

———————————

on this or any other claim.

[15]      An exemplary "data compression" subparagraph for claims 3, 4, 11, 121, 122, and 129 is set forth in claim 3:

> a processor coupled to the accessing circuit and generating data compressed video image information in response to accessed blocks of video pixel image information generated by the accessing circuit;

R1012.  An exemplary "data compression" subparagraph for claims 1, 85, 110-112, 119, and 157 is set forth in claim 1:

> a two dimensional spatial processor coupled to the buffer memory and generating data compressed video image information in response to the buffered blocks of video pixel information stored in said buffer memory and in response to the buffered two dimensional vector processed image information stored in said buffer memory;

R1010.  An exemplary "data compression" subparagraph for claims 6-9, 13, 14, 124-127, 131, and 132 is set forth in claim 6:

> A two dimensional frequency domain transform processor coupled to the accessing circuit and generating data compressed video image information in response to the accessed blocks of video frequency domain information accessed by the accessing circuit;

R1016.  Claim 112's "data compression" subparagraph is as follows:

> wherein the memory system is a video image data compression system;

R1073.  An exemplary "data compression" subparagraph for claims 2-14, 113, 114, and 120-132 is set forth in claim 2:

> a two dimensional vector processor coupled to the accessing circuit and coupled to the vector generator, the two dimensional vector processor generating

comprising the block memory of figures 6E to 6N and the raster scan address generator of figures 6O and 6P, we find no disclosure of the processor 'generating data compressed video image information,' as claimed." R1608.  It explained that "[t]he only compression mentioned in the specification is concerned with compression and decompression offline or online prior to loading into the image memory or in connection with an emulation program, not after it is stored in the block image memory." *Id.*  In other words, Hyatt successfully describes data compression, but he fails to describe data compression *of video image information* because he only describes data compression that takes place *before* the video image information is formed; he never describes the data compression as taking place *after* the image data has been stored in the memory.  R1608, 1609, 1611, 1617, 1620.  Hyatt's appeal to the Board relied upon Table 1, which the Board again found unpersuasive.  Because a reasonable fact-finder could conclude, as the Board did, that Hyatt failed to describe data compression of video image information, the Board's rejections of these claims are affirmed.

### 3.  Block Boundary Smoothing

The Board upheld the Examiner's rejections of twenty claims based on their common "block boundary smoothing" paragraph because it found "nothing in the specification that describes 'smoothing' or 'block boundary smoothing.'"[16]  R1616.  In his appeal to the Board,

---

data compressed video image information in response to the accessed blocks of video pixel image information accessed by the accessing circuit and in response to the two dimensional vector information generated by the vector generator;

R1011.

[16]     An exemplary "block boundary smoothing" paragraph for claims 34, 36, 42-45, 106-109, 141, 143, 145-148, and 169-172 is set forth in claim 34: "a block boundary smoothing processor generating block boundary smoothing information to smooth the pixel image

Hyatt directed them to Table 1, which lists the number of times and the page numbers on which the words "block," "boundary" and "smoothing" occur.  R832.  The Board considered this but again found it unhelpful, noting that the table "does not show written description for the limitation of 'block boundary smoothing' . . . ."  *Id.*  It explained that while the word "smoothing" appears in Hyatt's specification in a particular program, it refers only to "'SMOOTHING PRINTOUTS' without explanation." *Id.*  Furthermore, the program which contains the word "smoothing" involves conventional computer memory, "it does <u>not</u> use a memory having blocks or block boundaries and so is not relevant to the issue of block boundary smoothing."  *Id.*  It was reasonable for the Board to determine that "block boundary smoothing" was not adequately described because the specification only mentions the word "smoothing" one time, and even in that lone occurrence, it is not used in the context of "block boundary smoothing."  R234.  The Board's rejections are affirmed.

### 4. Quantization

The Board upheld the Examiner's rejection of claim 116 for lack of written description support for the limitation that "the weighting processor is a quantization weighting processor . . . ."[17]  R1617, 1619.  Based on Table 1, which Hyatt presented in response to the

---

information at boundaries between blocks of pixel image information; . . . ."  R1037.

[17]     The quantization subparagraph of claim 116 states:

wherein the weighting processor is a quantization weighting processor generating the weighted frequency domain image information as quantized weighted frequency domain image information by weighting the frequency domain image information generated by the frequency domain processor in response to the accessed weight information generated by the weight memory accessing circuit.

Examiner's determination that a quantization weighting processor was not described in the specification, R653, the Board found that quantization did exist somewhere in the system, but its mere existence "was not persuasive or written description support for the particular claim limitation at issue." R1619. The Board explained that "[t]he claim limitation is directed to quantization *after* the pixel image information is accessed (read) from block memory." *Id.* (emphasis added). Two of the programs in Hyatt's specification that involve quantization deal with loading a file to the image memory and prefiltering, both of which occur *before* the image information is accessed from the memory. *Id.* They therefore "do not appear relevant to the quantization written description at issue." *Id.* A third program, GRAPH.ASC (R216-18), "simply accesses (reads) pixel information out of memory . . . and does not perform any frequency domain processing, does not control the weight memory accessing circuit, and does not perform any quantization weighting of weighted frequency domain information." *Id.* In short, "Hyatt claims a post-processor data manipulation when his description is limited to data manipulation that is pre-processor." Def.'s Reply at 31. The court once again finds that a reasonable fact-finder could have reached the same result as the Board did, and the rejection of this claim is sustained.

### 5. Making a Product in Response to the Output Image Information

Finally, the Board upheld the Examiner's rejection of claims 153-172 based on the following exemplary subparagraph, set forth in claim 153: "the act of making a product in response to the output image information." R1084. Both the Examiner and the Board found that there was no written description support for "making a product." R1621; *see also* R655.

---

R1074-75.

In his appeal to the Board, Hyatt attempted to argue that the term "products" necessarily includes "machines," "manufactures" and "signals," and because he discloses a "signal," his written description for "making a product" is sufficient. R837. The Board expressly addressed and rejected this argument because in the limitation, which states "making a product in response to . . . image information," the "'image information' is the signal and the 'product' must [therefore] be something else, which is not disclosed." R1621. It went on to explain that the Patent Act only covers three product classes: machines, manufactures, and compositions of matter. An electrical signal is a form of energy; it therefore does not fall within any of the three product classes and cannot be claimed. R1622; 35 U.S.C. § 101. A reasonable fact-finder could determine that a "signal" is not a "product" and conclude that Hyatt's "making a product" claim therefore lacks an adequate description. As such, the Board had substantial evidence to reject these claims.

**C. Enablement**

Hyatt moves for partial summary judgment, arguing that the Board failed to meet its burden of proof in rejecting the claims for lack of enablement. The PTO concedes that its enablement rejections are tied entirely to its written description rejections. *See* Def.'s Mot. at 29. Having already rejected all of Hyatt's claims for lack of written description, the court need not decide Hyatt's motion for it is moot. *See Univ. of Rochester v. G.D. Searle & Co.,* 358 F.3d 916, 929-30 (Fed. Cir. 2004) (holding that upon affirming the district court's decision to reject the written descriptions, "we consider the enablement issue to be moot").

**CONCLUSION**

23

For the foregoing reasons, the court grants the PTO's motion for summary judgment and denies Hyatt's motion for partial summary judgment.  A separate order accompanies this memorandum opinion.


                                        Henry H. Kennedy, Jr.
                                        United States District Judge

Dated: September 30, 2005